IN this cause,* upon the testament of Thomas Williamson bearing date in june, 1787, whereof the words are:
‘I give to my said daughter (A) the interest of four thousand pounds in the government funds, during her life; and, at her death, i give the interest of the above money, one fourth to each of my grandchildren Sarah Cocke, Elizabeth Clements, Erancis Clements, and John Clements; and, at their decease, the principal and interest to be disposed by them to their heirs, in such proportions as they, by their wills, respectively, may direct; and in case of the death of my grandaughter Sarah Cocke, without issue, i give her part to my gran-daughter Elizabeth Clements.’
the question debated by counsil was, whether the plaintiffs intestate Sarah, to whom Elizabeth Clements the daughter had released her right to the interest of one thousand, part of the four thousand pounds, mentioned in the bequest, (B) was entitled to the said one thousand pounds, principal money? and the court, premising, that the release by the daughter who confessedly *was entitled to interest only during her life to the former husband of the intestate and herself, is unimportant to this disquisition, stated these positions t
The first position; Thomas Williamson did intend his grandchildren NOT to have the PROPERTY of the money; because,
first, the subject of the explicite gift to them, which is the only gift to them, except the gift of a power to direct to what proportions the heirs should succede, the energy whereof will in the sequel be defined, was interest only, the terms being ‘i give the INTEREST, of the above money, one fourth to each of my grandchildren;’
secondly, the property of the money is in terms devoted to the HEIRS of the grandchildren, in such proportions however as these, by their wills, respectively, may direct;
thirdly, the part of Sarah, that is, the part, whereof the interest was given to her, the testator, in case of her death, without issue, gave to his grandaughter Elizabeth-Clements.
The second position: the term, ‘heirs,’ which, in a devise or conveyance of land, is said to be a word of (C) limitation of estate, that is, to declare the quantity of estate in the land to be taken by the devisee or purchaser, although it may be sometimes, as in case of contingent remainders, a word of purchase, that is may designate the persons who shall take the land, can, in a. bequest of chatels, be understood only to indicate the takers, and, in this case, indicates them, namely, those whom the law hath appointed to succede to the heritable rights of one who died intestate, by characters infallible, insomuch, that, by a bequest to the heirs of A, the parties intitled maybe demonstrated with no less certainty than if they had been described' by the appellations children, parents, brothers and sisters, &c, successively of A; and, by the term, ‘heirs,’ in the bequest where the testator named the grandaughter Sarah and refered to her particularly, he intended-children, which confined sense, as to her, is indubitably proved by the gift, in the event of her death without issue, that is, children then living, to another grandaughter.
The third position: words in a testament ought not to be rejected, or be rendered ineffectual, if they be significant, and may be interpreted in a sense which is not contrary to law. (D)
The fourth position: the sense of the terms, ‘at their decease,’ that is, at the decease of the grandchildren, ‘the principal money and interest to be disposed by them to their heirs,’ unconnected with the preceding member of the paragraph, is *defective, because among those terms is not any verb which governeth, in the language of grammarians, or acteth upon, the words principal and interest; but the words, ‘i give,’ occurring before, are understood, in like manner as if they had been repeated after the word ‘decease,’ and thus supply the seeming chasm in the sense, consistently with the intention of the testator, as will appear hereafter.
The fifth position: that by the term, ‘disposed,’ is not understood, ‘given,’ implying *293 a power in the grandchildren to dispone the ■principal money to whom, as well as in whai proportions, they pleased ; because that would contradict the testatois declared will, that the grandchildren should not have the property of the principal money, but is to be understood ‘distributed ;’ impowering them, not to give the money* or to designate the donees but, to adjust the portions thereof which the donees, designated by the testator, should take.
One proper sense of the word ‘disposed’ is distributed simply, as appeareth by these examples of writers in the language from which the word hath been adopted into our language:
Potnpeius ex urbe profectus iter ad legiones habebat quas a Caesare acceptas in Apulia hibernorum causa, DISPOSUE-RAT. Caesar,’ b’ c’ 1’ I. Pompey went from the city to the legions, which received from Caesar, he had DISPOSED, that is, DISTRIBUTED, in winter quarters in Apulia.
Scipio retentum secum Baelium, dum •captivos obsidesque et praedam ex consilio jeus DISPOISTERET, satis, &c. Romam-■jnittit. Livii, T 26. Scipio, having retained with him Laeiius, until, by his advice, he should DISPOSE, that is, DISTRIBUTE, the prisoners, hostages, and plunder, after dispatching these affairs, sends him to Rome.
DISPONERB diem is used by Tacitus, Suetonius, and others, to signify division of the day into portions for particular occupations devoted to each.
Opus et requiem pariter DISPONIMUS ambo. Persii, sat’ S. we both DISPOSE, that is, DISTRIBUTE, the same hours to labour and rest.
The sixth position: the meaning of the whole bequest is exhibited truly by this paraphrase, variant from the text only by supplement of the ellipsis and insertion of the synonyma embraced by crotchets: ‘i give the interest of the above money, one fourth to each of my grandchildren Sarah Cocke, Elizabeth Clements, Francis Clements and John Clements, and, at their decease, [i give] the principal and interest, to be DISPOSED [that is, DISTRIBUTED] to their heirs, in such ^proportions as they, by their wills, respectively, may direct.’
Scholium: the comparison of adjudged cases, quoted by counsil for the plaintiff, to prove that a power to dispone a thing involveth a right to the thing, with the principal case, is altogether inept; for,
first, in the cases quoted, he, who had the disponing power, was, in explicit terms, devisee of the land or legatary of some other subject for a time; in this case, the principal money was not, in explicit terms, bequeathed to the grandchildren, nor, if bequeathed to them at all, bequeathed otherwise than by implication from the words, ‘at their decease the principal money and interest to be disposed by them;’ and the question is, whether the power of the grandchildren to dispone the money, which was not bequeathed to them, but of which the interest only was bequeathed to them, implicated a right in the grandchildren to the money itself and authorised arrogation of it to themselves? so that the argument from those quotations, proving, that a devise or bequest of a thing to one for a time; with a power to dispone it afterwards, transfereth to him the property, compared with the principal case, where the proposition to be proved is, that a power in the grandchildren, to whom the interest, the use of money, for a time was bequeathed, to dispone that money afterwards to their heirs, involved a right to the money, is a petitio principii, the sophism to which a candid rcasoner disdains to resort:
secondly, in the cases quoted, the power to dispone was general: in the principal case, the disposition, which the grandchildren had power to make was special, ‘to their heirs,’ that is those whom the law appointed to succede to the inheritable property of the grandchildren; so that the argument from the cases quoted, proving that one, who hath power to dispone a thing to whom he will, must, by implication, have a property in the thing, applied to the principal case, to prove that he who hath power to dispone a thing to persons particularly designated, must, by implication, have property in the thing, and consequently may disxione it to whom he will, is a mistake of the question: nor is the case between (B) Shermer and Richardson, on which the counsil for the plaintiff relied, an exception to what is here stated; for the devisee there had power, not to dispone to their heirs only, but, to make whom she thought proper her heirs, which was equivalent to g-eneral power to dispone:
thirdly, in the cases quoted, the property was adjudged to be in him who had power to dispone, in order that the will of the testator might be fulfilled; in the principal case, adjudication of *the property to be in the grandchildren, who had power to dispone, would, instead of fulfilling, defeat the will of the testator.
The seventh position : the heirs of every grandchild, by which heirs, in the case of the plaintiffs wife, the testator undoubtedly meaned children, will take, if his or her will direct not what proportions they shall have, one fourth part, in equal portions; because when a subject is given to several, to be distributed among them discriminately or otherwise, at the election of him who is appointed to perform that office,
first, the refusal or neglect of the distributor cannot injure the donees; for he is a minister only, not an owner:
secondly, if he do not exercise the power, the praesumtion is, he declined it, because he did not choose to distribute unequaly, in which case his function was unnecessary; for distribution among associates ought naturaly to be equal, if the contrary do not appear:
thirdly, if the heir be single the distributor cannot act at all: fourthly, all the donees, who were entitled *294 to the whole subject of distribution, may, by mutual agreement, control the distributor, disaffiiming and frustrating any partition equal or unequal by him, and therefore may prevent it.
The eighth position: the bequest of the principal money to the heirs of the grandchildren, or in other words, to those whom the law appointeth to succede to their inheritable property, was not contrary to law.
If the testator, for the phrasis, ‘heirs,’ (F) had substituted its periphrasis, this part of the bequest would have been read thus: ‘at their, my grandchildrens, decease, [i give] the principal and interest to [those who will inherit their lands] in such proportions as they, [except my grandaughter Sarah,] by their wills, may direct, and, in case of the death of my grandaughter Sarah Cocke, without issue, [without lineal successors] i give her part to my grandaughter Elizabeth Clements, [singly not in a communion with her brethren.’]
That such was the will of the testator is believed to be manifest, and that it was not contrary to any principal of law is likewise believed, because the events, upon which the bequest would become efficacious, must happen within the times during which rights by such a bequest may be in suspense: for the heirs, if any exist at all, will exist, of the grandaughters immediately, and of the grandsons at the end of about nine months at farthest, after their deaths.
If these positions be true, as they are thought by the court to be, the consequence unavoidable is a negative decision of the question, in the principal case before propounded; and that the ^plaintiffs , wife Sarah could have disponed one fourth part of the money to her children, or their descendents only, and her sister, when she was living, could have disponed, and her brothers can dispone, the other three parts to their children, or to their descendents, and, in default of them, to their heir in the ascending line, or to their collateral heirs; but to none other. — and hence the carollary must be,
the decree reviewed is affirmed.
NOTES.
(A) She was Elizabeth Clements.
(B) The plaintiff succedeth to her, if she were intitled, and is not accountable to her kindred.
(C) By a conveyance or a devise of land to Timothy, and to his heirs, the purchaser or devisee took an estate most ample, so that it was UNLIMITED, whereas if the word, ‘heirs’ had been omitted, and terms aequivalent had not been substituted, referring to some former act of conveyance, in one instance, or signifying the testators will, in the other instance, an estate BIMITED was taken; yet, ‘heirs,’ in law vocabularies, is a word of EIMITATION, this must be an avn^am^. ‘heirs,’ isa word of LIMITATION, because it, or the aequivalent with it, was necessary to transfer an estate UNLIMITED, ‘heirs of the BODY,’ indeed are strictly words of limitation.
(D) By the decree of the county court, reversed by the high court of chancery, and now proposed to be restored, that the decree of the latter may consist with a decree of the supreme court in another cause, the words in Thomas Williamsons testament, ‘and in case of the death of my grand-daughter Sarah Cocke, without issue, i give her part to my grandaughter Elizabeth Clements,’ were entirely rejected, significance of those words, ‘in case of the death of my grandaughter Sarah Cocke, without issue,’ in this sense: ‘the contingent gift to Elizabeth of Sarahs part shall be effectual, when a failure of the latters progeny shall happen, either at the time of her death, or at a more distant period,’ is undeniable. the words can have no third meaning.
About the end of last century, english judges would have understood that event to have been within the scope of the testators contemplation, by which he would have been thwarted, and she who was the object of his beneficence, would have been disappointed, in a fond or a servile compliance with what those judges called a rule of law, that is, a rule of interpretation commented by themselves, or coming to them by tradition from *their
predecessors, and in contradiction to the testators words, uninfluenced W r (1’ ‘by the RESPECT, which all men fñjtras' have agreed to pay to the WILL reports of the dead. ’ } voi’)
Succeeding judges, ‘in the progress of their struggle for the intention against a rigid unjust rule,’ would, as until lately was believed, have understood the other event to have been contemplated, according to the plane meaning of the words; whereby the wish of a grandfather, and the hope of her whom he most favoured of his offspring, might have been gratified, without violating any principle of law truly so called, or contravening, except peradventure in one instance, any cases adjudged, to be found in the term reports, transatlantic or cisatlantic, or other modern publications, of responsa prudentum.
(E) ‘I am free to own, that, where a testators intention is apparent to ME, cases must be STRONG, UNIFORM, and apply POINTEDLY, before they will PREVALE to frustrate that intention;’ by the president of the court of appeals: of which the converse is: ‘I am free to own, that, where a testators intention is apparent to ME, cases, which ‘are STRONG, UNIFORM, and apply POINTEDLY, WILL ‘PREVALE to FRUSTRATE that intention.’
Observations and questions:
1 This, although delivered in the first person, ‘i’ and ‘me,’ is supposed to have been the sentiment, unanimous sentiment, *295 of the conclave; because the report, corrected ‘from the notes of him’ who was praeses, doth not show that any were dissentient; because it is ‘declared to be the opinion of the court, ’ that is, for any thing hinted to the contrary, the whole court; and because it seems then to have been settled, and to have become a rule of property.
2 Strength of a case, distinct from its uniformity and pointed application, is believed to be ratiocination, cogent of assent to propositions intended to be verified.
3 By uniformity in the cases is understood, either a harmony of them with one another, or a symmorphosis, a likeness in form, in meaning, with that to which they were compared. — which ever be the sense, aptly may be here remembered these words of the president, delivering the opinion of himself and his assessors, in the case between Shermer and Shermers executor : ‘several cases have been cited, but they seem '"to verify the saying of a judge: “that, in disputes upon wills, ’So it is cases seldom illucidate'* the subject, written, which, depending on the intention of the testator, to be collected from the will, and from the relative situation of the parties, ought to be decided upon the state and circumstances of each case,” to which i will add: that i have generaly observed, that adjudged cases have more frequently been produced to disappoint, than to illustrate, the intention.’
Now: in the dispute between Godwin and his wife, plaintiffs, and these defendents, when the court of appeals, upon this will of Thomas Williamson, determined, that his grandchildren were entitled to the money, which by the bequest before recited they were empowered to dispone to their heirs, determined so upon authority of the cases cited, and principaly, as hath been said, upon authority of the case between Shermer and Shermers executor:
was not ‘the intention APPARENT TO’ the sage president, and to every other member, that the grandchildren SHOULD NOT, but that their heirs, in some proportions or other, SHOOED, have the principal money? whether that intention was illegal, is not now the question:
were the cases cited, in panoply complete, with all their armature, so STRONG, whatever or wherever their vigor was, and the harmony of them with one another, or the symmorphosis, likeness in form, in meaning of them with the principal case, such, that they PREVAEED to FRUSTRATE that intention? do the six first paragraphs, that is all but one, of the courts opinion in the case upon Shermers will, apply to the case upon Williamsons will? if the strength of Shermers case applied to the other, be in that part where some insects are armed with stings, and if it be potent there, doth it not oppugn ineluctably the reversal which it was adduced to authorize?
did the cases cited ‘illucidate,’ elucidate, or dilucídate ‘the subject’ of disquisition, and assist the judges to discover the POEAR STAR, which directed them in the construction of the will, and guided the decision,’ so that it shone more brightly than it shone before? men use the darkened lens of a telescope, when the}' contemplate the suns disc, or the faculae, or maculae, or other phaenomena, on the face of that luminary, that they may not be dazzled or blinded by the splendor of its rays, but use every optic aid, that the medium, through which opake bodies are viewed, may be pellucid as possible,
some judges, when they propose to discover a testamentary polar star, condense, by confusing with a mist called authorities, the medium through which the object is confessedly to be discerned, *obscure its atmosphere with a soot called technical words, and leave certain people doubting whether the star, which the testators words indicated, defining it with such accuracy that an un-law-learned man, who would credit the information of his senses and hearken to the suggestion of an unperverted understanding, would swear it could not be mistaken, was or was not the star, which should ‘direct the judges in the construction of the testators will — doubting, because law-illumined astronomers had, by the ri-xnj ‘cpfit/vmriM!, skill in the art of interpretation, discovered, and had, by an irreversible and therefore infallible judicial sentence, declared, that the star, upon which ordinary observers were gazing, was as different and as distant from the star, ‘which is to guide the judges decision’ as Mercury from Herschel. in truth, law-interpreters have vv r 271. deprived the STAR, intention, of POLARITY, rendering it planetic, erratic, so that they seem to verify the saying of a judge ‘a will may be any thing, every thing, no thing.’
Did the case upon Shermers will, giving the profits of his whole estate to his wife for her life; impowering her to make whom she pleased her heir or heirs of one half;
giving that half, not to her heir, but to whom she should think proper to make her heir or heirs; in effect, giving to her immediately dominion, full dominion, of the half, so that she might have disponed it, to whom she pleased, when she pleased, for a disposition at any time would have been effectual, and how she pleased: — did this case apply POINTEDLY to the
case upon Williamsons will, giving, not the money, but, the interest of the money, to his grandchildren ;
not empowering them to make whom they pleased their heirs;
giving the money, not to those whom the grandchildren should think proper to make their heirs, but, to those who by law would be made heirs of the grandchildren, refering apportionments of shares among the heirs to discretion of their respective ancestors; and is not the case upon Sher- *296 mers will, if it apply to the case upon Williamsons will, in any point, in point-blanc opposition to it?
do not these words of the venerable president ‘he, John Hhermer, does not give her, his wife, a power to dispose, but to name the person or persons she might chuse to succede to her part, TO WHOM the testator GIVES the money,’ and the reversal of the decree, in Godwins case, upon Williamsons will, if this were founded on that, strike an ear, not the most *acute, with a óiafovm, a dissonance in the cases; did he, Thomas Williamson, give to his grandchildren a power to name the persons who should succede to the money; on the contrary, are not those successors, or rather proprietors of the principal money, named by himself; and did he give the money to those whom the grandchildren should chuse to succede; on the contrary, did he not give the money to those whom he chose to succede?
If the opinion in Ayletts case be, as it is there called, a ‘PRINCIPLE,’ so ‘SETTLED that it had become a RULE of
PROPERTY,’ is not the converse of the opinion a ‘PRINCIPLE’ too, and must it not‘become a ROLE of PROPERTY,’ as well as its antitype.
If judges can form rules for interpreting wills of ‘testators IGNORANT of the technical sense affixed to words by professional men’' — testators, unassisted by those professional men, ‘often when their wills are made in extremity reduced to the necessity of resorting to any person, however unskilfull, ’who maj' be at hand’ -if the judges can convert these rules into ‘PRINCIPLES, SETTLED RULES of PROPERTY,’ can declare, that against them, where the adjudged cases approving them are said to be STRONG, although not a single reason, as in the case of Rose and Bartlett, and other cases, is pretended in justification of them, to be UNIFORM and to apply POINTEDLY, terms not defined, nor perhaps defineable, intentions of testators, APPARENT intentions, WILL NOT PREVALE — may not judges ‘mould testators wills into any forms, which whim, fancy,- or worse passions, may suggest?’
When the testator is admitted to have intended one thing, is not to adjudge him to have intended another thing, and that this shall PREVALE against that, the same as to adjudge that what IS his will IS NOT his will, and sufficient, when +his is named interpretation, to justify a prosopopoeia of common sense hooting such jargon?
Further observations upon rules formed by judges, for interpretation of testaments, that is, for explanation of words in them, so that they may be understood by those who did not understand them before:
Judges, probably, if they had not been perplexed by rules juridicaly praescribed by themselves or their praedecessors, would have expounded a testators words, unless they were terms of art, in the sense which other men, as well acquainted as their - selves with the language, attributed to them*, resorting to those ^sources of invention, which circumstances, too
many for enumeration, too various for specification, suggest for investigating his intention:
—would have expounded his words, if they were terms of art, simple and un~ aequivocal, in the sense attributed to them by skilfull professors of the art;
■ — would have expounded his words, if they were terms of art, but aequivocal, so as to be intelligible, in a demotic, popular, or in a technic, artificial sense,- — in one of which the testament would have been valid, in the other void — would have expounded his words in the former sense, and rejected the latter; prefering that to this, ut res magis valeat, by the benignity, quam pereat, by the malignity, of the law —the law, which favours the praesumtion, that the testator intended what he could do, rather than that he intended what he could not do. When judges, who‘disclame all legislative power to change the law,’ pronounce, that a will shall not be performed, because the testator had not declared his meaning in language, which was prescribed by rules of interpretation, rules of construction, as they sometimes are called — -(truly called so, for properly construction is building, taken for exposition by a metonomy, and wills are often, according to rules of construction, built, not interpreted, by english judges) — although his meaning was declared in language which could not be misunderstood — rules, of which he had never heard — rules,- which although attempted to be dignified by their makers classing them with rules of law, are defective in a quality essential in the constitution of laws, having never been so promulged that they can be known by those who . are not professionalists — do not judges, forming -these rules, and ad-haering to them so .that cases where they have been recognized ‘will prevale against APPARENT intentions’ of testators, assume authority to fabricate types ‘for moulding testators wills?’ do they thus ‘regard the testators own words, and
compare them with his circumstances, and the relative situation of the devisees?’
do they not oppose their rules of construction to the law, making *the commandment of it, THAT THE WILL OF THE TESTATOR ORDAIN *297 ING WHAT IS LAWFUL SHALL BE PERFORMED, of none effect by their traditionary interpretations? if this be not, 4 what is, assumption of a legislative power’ — power to change the law,’ to abolish the law? ought such rules of interpretation, if it must be called interpretation, to ‘become EXILES of PROPERTY?’ if english judges change some of their rules, as frequently they have done, will their apes, dictu nefas, be found among judges — in the latitude— of Virginia 1
One would suppose, rules for interpretation of testaments should tend to illustrate intention, should be consistent with themselves, be simple.
But, as we are taught, ‘adjudged cases,’ in which we find these rules, ‘have more frequently been produced to disappoint than to illustrate the intention.’ Instead of consistency, ‘apparent clashing of the cases relied upon,’ in some instances, where these rules have been applied, is confessed, and in numberless others may be shewn.
Instead of simplicity, judges by the 'W r 102 canonic art, skill in forming rules, for interpretation of wills have ‘tied, a gordian knot.’
Why gordian knot? the tot (v ou n/<r a/nair/c o UcafuK, the vinculum inextricabile, to which is here alluded, is said to have t>een serie vinculorum ita adstricta, ut unde nexus inciperet, quove se conderet, nec ratione, nec visit, per-cjpj posset, now we learn, that the judges tying this knot, were instigated by the ‘spirit of the feudal system;’ so that the judges, who have been since struggling,’ we are not told how long, ‘since to untie it,’ and who possibly knew unde nexus inceperat, and therefore could have found one end of the cord with which the knot was tied, must have been clumsy, if they could not find, quo se condidit, the other end. the pellaean hero, if he had been so lucky as to discover the begining of the cord, with which the phrygian knot was tied, would have been more dexterous, and probably by ravelling it, would have fulfilled an oracle, instead of eluding it, by the discission, this expedient, however, is commended: for we are informed, ‘it would have been better if they, ENGLISH judges, had cut it, the knot, at once.’ yea verily? ■would it have been better? if so, why did not, why do not, Virginia judges imitate the macedonians example, since, ‘by the american revolution, and some of our laws, we have happily got rid of the feudal system;’ and the spirit of it in this part of the globe hath been exorcised? they would have been, they will be, acquited of temerity *which was ascribed to him, an(l might have avoided, may still avoid, agonies which english judges suffer, in their ‘struggle for the intention against rigid unjust rules of law,’ that is, rules of interpretation.
The english structure of canons, rules for interpretation of testaments,’ ‘unfortunately admitted,’ — '‘unfortunately truly for all but those, who, like Demetrius and his suit, ‘by this craft have their wealth>. — a structure of rule for expounding testaments, that is, for defeating, inten-£jons Gf testators’ (for to call it interpretation and exposition, if not ironically, must be nonsense) a structure W r pas-agreed tobe an imp of the feudal sim stock — may be resembled rather to the Cretan labyrinth, for expediting us from its meanders, our Daedalus, who Virg’ ■ — —----ipse dolos tecti ambages-
que resolvit,
Caeca regnes filo vestigia, --
the general assembly shewed the clew, execrating, in our system of jurisprudence, every part formed of feudal materials, or fashioned in feudal style. How we shall profit by the indication may be augured by the case of Ayletls executor against Aylett, and by the *eulogy which no doubt was extremely delectable to him whom it blandished, and ‘whose laborious researches on such occasions were pleasing to the court.’
(E) Let us suppose the testator to have used instead of the word, ‘heirs,’ the syllabus of it, taken from the statute directing the course of descents, when the bequest would have been written thus: ‘at my daughters death,
‘i give the interest of the money to my grandchildren Sarah Cocke, Elisabeth Clements, Erancis Clements, and John Clements, one fourth to each; and at their decease,
‘ [i give] the principal and interest]' to their children, to their descendents, to be disposed by them, in such proportions as they, by their wills, shall direct;
†‘ if no children nor descendents of my grandaughter Sarah Cocke be, i give her part to my grandaughter Elizabeth Clements ;
‘if no children nor descendents of my other grandchildren be, [i give their parts of] the principal and interest to their father,’ here supposed to be the same man. the testator probably *did not intend this : but such must have been the effect, if the father were living; ‘if the father be dead [i give their parts of] the principal and interest to their mother,’ also supposed to be the same woman, ‘brothers and sisters, and their descendents or such of them as there be in such proportions ;’ and so forth.
That the testators words may be understood in this sense is incontestable, and that they ought, even in opposition to ‘cases strong, uniform, applying pointedly,’ to be understood in this the demotic sense, by which his intention may be fulfilled, rather than that his intention should be counteracted, defeated, by exposition of *298 the word, ‘heirs,’ in the technical sense, is -t'hold here
Shaksp’ -give thy thoughts no tongue.
MANTISSA.*
‘The rule is laid down, in Rose and Bartlett, by all the judges, that where a testator, having both freehold and leasehold lands, in a particular place, devises ALL his lands in THAT place, only the freehold lands shall pass,’
‘Le report del case argue en le common banke devant touts les justices de mesme le banke en le quart an du raygne de roy Jacques, entre ‘Matthew Stradling, plant,’ et Peter Styles, def,’ en un ac(-ion propter certos equos colo-ratos, anglice, pyed horses, port per le dit Matthew vers le dit Peter, le recitel del case. Sir John Swale, of Swalehall in Swale dale fast by the river Swale, k’t, made his last will and testament: in which, among other bequests, was this, viz. ‘out of the kind love and respect that i bear unto my honoured and good friend mr Matthew Stradling, gent,’ i do bequeath unto the said Matthew Stradling, gent,’ ALL my black and white horses.’ the testator had six black horses, six white horses, and six pyed horses.' le point, the debate therefore was, whether or no the said Matthew Stradling should have the said pyed horses, by virtue of the said bequest, this case was argued by Atkins, apprentice, pour le pi,’ and by Catlyne, serjeant, pour le defend.’ le court fuitlongement en doubt, de , rest matter; et apres grand DELIBERATION en judgment fuit donne pour le pi, nisi causa, motion in arrest of judgement, that the pyed horses were mares; and thereupon an inspection was prayed, et sur ceo le court advisare vult.’
*These two cases ‘apply POINTEDLY.’ the resolutions of them are contradictory.
Stradling versus Styles, although, adjudged, if indeed the case ever existed, long before Rose versus Batlett, as may be conjectured from divers considerations, doth not appear to have been cited in the argument of the latter case; probably for these reasons; first, the reports of master Scriblerus had not been published; second, if they had been published, they would have been disregarded, not being authorized by the judges, imprimatur; last, the name of the supposed author is believed to be fictions, and to have -been assumed by a certain COMMON SENSE, who, long a probationer, had not, in the time of George Croke, knight, reporter of Rose versus Bartlett, been able to become a licentiate, in Westminster hall, even of an ouster barristers degree.
‘Thus settled’ (the principle in Shermers Wr 302 case) ‘it has become a rule of property’ (that is a law, which the judges who assumed authority to ordain it, have, and their successors will have, equal authority to abrogate) ‘which the court cannot depart from without disturbing MANY • titles enjoyed under this LONG ESTABLISHED PRINCIPLE.’
If the present judges shall not abrogate these rules and principles, their successors will not want logic to prove that those who can make, who can ESTABLISH, can defeat, can DEMOLISH, RULES of property, that is, LAWS.
If precedents be requisite, they are at hand. ‘*EURNISHED,’ by the court of appeals: for example:
‘The court cannot depart from a rule of property,’ by which they mean a judicial rule of interpretation, as it is explained by themselves, ‘without disturbing titles.’ then they may depart from the rule, if it be a bad rule, and if departure from it will quiet more titles, than adhaesion to it will disturb.
Again for a more POINTED example.
‘The judges after laying down the true rule, built upon intention, unfortunately admitted that, if there be no words of limitation the common law rule must prevale; by which they tied a gordian knot, which they have since struggled to untie, it would have been better if they had cut it at^once.’
Now, with what was this knot tied? with ‘rules of interpretation, rules of construction, prin-are rules of property,’ but laws? who ‘tied the knot?’ judges. who formed the rules? judges, who ‘have struggled to untie the knot?’ judges, who ‘would have done better if they had cut it?’ *judges. ‘atonce;’ when? not before the knot was tied by preceding.judges, surely, what is the proper, instead of the metaphorical sense of ‘tying, struggling to untie, cuting, the knot?’ forming rules of interpretation, rules of construction, principles, rules of property, was tying.’ endeavoring to change them was ‘struggling to untie, declaring them to have been originaly contrary to law was ‘cuting.’
Consequently the court of appeals authorized abrogation of rules for interpretation of testaments.
Here upon the concession of the court of appeals, that, for interpretation of wills, ‘the rule built upon intention’ is the ‘true rule,’ deserves to be remarked, if it were a true rule, it was a common law rule, if it were a common law rule, the rule ‘the judges unfortunately admitted to prevale against it,’ is a false rule, and the proposition that it, was ‘the common law rule,’ involves a contradiction.
‘Erom the rule of property,’ the rule of construction, ‘settled by judges and chancellors,’ in the case of Rose and Bartlett, and some other cases, in England, ‘the court could not depart,’ in the case, of notable celebrity,* between Ay-letts executor and Aylett, ‘without dis *299 turbing MANY titles, enjoyed under this LONG ESTABLISHED PRINCIPLE.’ will obsequence of that glaringly false unjust principle, or deviation from it, think you, produce the most quietude or disturbance in this country? probably the case hath frequently happened, ‘where a testator, having both freehold and leasehold lands, in a particular place, devised ALL his lands in that place,’ and been settled, without litigation, by the parties, who had not been informed of this ‘LONG ESTABLISHED PRINCIPLE,’ according to his ‘apparent intention.’ and perhaps ‘MANY titles have been enjoyed peaceably and quietly under’ such settlements, we hear of a single instance, in this country, where any person had questioned, whether ‘only the freehold lands should pass by such a devise:’ in other words, whether the postulate of Euclid, in his elements, that the whole is greater than its part,’ ought to be granted, if so, when Washingtons reports shall be, as they quickly will be, in the hands of every leguleius, indefatigable in his ‘researches’ after adjudged cases, Wr no and ambitious to deserve the ‘opinion, that what is not produced by
[Noth. Bill of review in this case was allowed, March 1796. The decree reviewed and affirmed, ut supra p. 843. 1. 8, 1799; and case taken to Court of Appeals. 5 Call 160. — lid.]—Note in edition of 1852.
him, in favour of the *side he advocates, does not exist,’ this case of IV r 30:2 Aylett, ‘for which nothing can be said, but that in Ayletts will are no
words or circumstances to shew an intention, which do not appear in the case of Rose and Bartlett, instead of being a finis litium, will multiply them, and be as prolific as the fabulous hydra, or that species of the true hydra called the polypus.

Mr. Green here refers to 10, Sim. 491, Blewitt v. Roberts; 9 Sim. 161, Archibald v. Wright; 2 Keen, 54, Cooper v. Bowler, &c. — Note in edition of 1852.

A) &c. refer to notes at end of the case. — Note in edition of 1795.

Marcus Pomponius Marcellus, cum ex oratioue Tiberium reprelaendisset, afirmante Ateio Oapitone, et esse latinum, et, si non esset, futurum, ‘certe 3 am infle mentitur, inquit, Oapito. tu enim Caesar, civi-tatem dare potes 'hominibus, verbis non potes.’ Sueton’ de illust’ grammat,’ 22. interpretation of words, which are not legal terms of art, is not peculiarly within the judicial sphere, and legal judges can, by their cases, precedents, authorities, rules of construction, or whatever else they please to call them, no more ‘ESTABLISH for PRINCIPLES, and RULES of PROPERTY’ false interpretations of such words than a roman emperor, as he was told by honest Marcellus, with a generous boldness, although he might grant freedom of the city to foreigners and barbarians, could denizate or naturalize a soloecism: — a power which the base Capito, with the servility of a cringing court favourite yielded. — Note in edition of 1852.

Itranspositions, by which the construction, in either sense, without the least change of meaning is more perspicuous. — Note in edition of 1852.

If In this case the intention appeared CLEAR, w qni> that the ‘lease — hold land should pass, the vv court would give a decision according to this principle, IN SUPPORT OP THE INTENTION; hut WE can discover NO SUOH INTENTION.’ these words have heen read by some people without STARING! — Note in edition of 18B2.